UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMER ALI-HASAN, M.D.,<br><br>                                      Plaintiff,<br><br>           -against-<br><br>ST. PETER'S HEALTH PARTNERS MEDICAL ASSOCIATES, P.C., and ST. PETER'S HEALTH PARTNERS,<br><br>                                   Defendants. | **<u>Complaint</u>**<br><br>**<u>Jury Trial Demanded</u>**<br><br>Case No. |

Plaintiff, by his attorneys, Cooper Erving & Savage LLP, for his complaint herein, alleges as follows:

## INTRODUCTION AND JURISDICTIONAL STATEMENT

1.      This is an action alleging discrimination in employment on the basis of his sex in violation of 42 U.S.C. § 2000e-2 ["Title VII"].

2.      The jurisdiction of the Court is invoked pursuant to 42 U.S.C. § 2000e-5, and 28 U.S.C. § 1331.

3.      The Court has subject matter jurisdiction over plaintiff's State law breach of contract claim pursuant to the doctrine of pendant or supplementary jurisdiction and 28 U.S.C. § 1367.

4.      Venue is properly laid in the Northern District of New York, under the provisions of 28 U.S.C. § 1391, in that all, or a substantial part, of the events or omissions giving rise to the claims alleged herein occurred within this District and all of the parties reside, or are located, in this District.

5.      Plaintiff demands a jury trial of this action.

6.      Plaintiff Samer Ali-Hasan filed a complaint with the United States Equal Employment Opportunity Commission [EEOC] on or about October 21, 2019, in which he alleged that he had

been discriminated against at his place of employment on the basis of sex.

7.      EEOC issued a notice of right to sue letter on November 12, 2019.

## PARTIES

8.      Plaintiff Samer Ali-Hasan is a 50 year old male and a resident of Albany County in the State of New York.

9.      Plaintiff began his employment as an interventional cardiologist with Albany Associates in Cardiology, which is part of St. Peter's Health Partners Medical Associates (SPHPMA) on June 15, 2015.

10.      Plaintiff was terminated from employment by letter dated July 31, 2019, though he was kept on the payroll until January 27, 2020, consistent with "a termination for convenience" provided for in his employment contract.

11.      Defendant St. Peter's Health Partners Medical Associates, P.C. [SPHPMA], is a professional corporation organized and existing by virtue of the laws of the State of New York.

12.      Defendant St. Peter's Health Partners [SPHP] is a not for profit corporation organized and existing by virtue of the laws of the State of New York.

13.      The defendants were joint employers of plaintiff as that term is used in Title VII.  The former or P.C. is a physicians group, while the latter is a hospital management organization.  The SPHPMA provides medical services to the facilities operated by SPHP.  Among other things, SPHP provides human resources services to SPHPMA.  Although plaintiff was terminated as an employee of SPHPMA, this action was carried out by Anna Bauer who is a human resources official of SPHP.  As alleged herein, Ms. Bauer was involved in the matters that led to the termination of plaintiff's employment.

## FACTUAL ALLEGATIONS

14.      Plaintiff was hired to build SPHPMA's cardiology practice (Albany Associates in

Cardiology) in the Troy market, which he did.  The cardiology practice became very competitive in the Troy market, and was included in the call schedule because of plaintiff's hard work. Albany Associates in Cardiology was competing against Capital Cardiology Associates, a larger private group.  Plaintiff's work was acknowledged as successful.  Many cardiologists from Albany Associates in Cardiology before plaintiff tried to build the Troy market but failed. Plaintiff worked countless hours way beyond what was required, including weekends when he was not on call, to accomplish this goal for SPHPMA

15.     Plaintiff's initial contract was for 3 years and then he was voted in as a partner afterwards.  Plaintiff never had any formal complaint against him nor was he subject to any disciplinary action.  As explained herein, plaintiff was never shown any complaint against him even when such an alleged complaint supposedly led to the termination of his employment.

16.     Plaintiff's personal and academic reputation are beyond reproach.  His medical knowledge and technical skills are at very high level and standards.  Plaintiff had the good fortune to train in the best and most competitive programs in the country.  Plaintiff did 16 years of training after high school.  He is one of the most trained interventional cardiologists in the Capital District. Plaintiff did four separate fellowships and subspecialties in addition to his internal medicine residency training.  Plaintiff was one the most financially productive providers in the group regarding revenues.

17.     In the course of terminating plaintiff's employment, SPHPMA and its board of directors humiliated plaintiff and damaged his reputation for no good or objective reason.  Fair process was completely lacking.  Ordinary investigatory or due process procedures used in other cases were not followed.

18.     Plaintiff's termination began when he received a call on July 30, 2019, from Craig Knack, who is an administrator in the cardiology practice, telling him that he needed to meet

with Kellie Valenti (interim president, SPHPMA) and Dr. William Kowal (SPHPMA chairman of the board) on July 31, 2019 at St. Peter's Hospital executive floor conference room.  Plaintiff asked Mr. Knack the reason for the meeting.  He said it was regarding a complaint filed against plaintiff.  Plaintiff inquired as to the nature of the complaint.  Mr. Knack said he did not know. Plaintiff then called Dr. James Phillip, president of the cardiology group, to inquire about the meeting.  Dr. Phillip shared with plaintiff that the meeting was about a complaint but that he did not know any details.  He recommended that plaintiff go to the meeting.

19.     On July 31, 2019, plaintiff met with Kellie Valenti and Dr. William Kowal.  The meeting was short.  No details of the complaint were provided.  They informed plaintiff that he had a complaint filed against him, that Human Resources did two weeks of investigation, and that Human Resources recommended terminating plaintiff's contract with cause.

20.     Plaintiff was never interviewed in connection with the so-called investigation.  He was never given the opportunity to rebut any of the allegations or to even suggest witnesses that might support his view of events, whatever those may have been.

21.     Plaintiff was told at the July 31 meeting that the Human Resources recommendations had been shared with the SPHPMA board of directors (5 members).  Plaintiff was told they unanimously approved the HR recommendations.   Plaintiff was also told that these recommendations were shared with the cardiology practice's JOC (joint operations committee), which recommended a change to termination without cause supposedly so that it would not adversely affect plaintiff's future employment.  The nature of the complaint was not shared with the JOC. Plaintiff was given a document signed by Kellie Valenti, dated July 31, 2019, stating that his contract was terminated without cause effective immediately and that plaintiff would be paid for 6 months including benefits until January 27, 2020.  Plaintiff again asked Ms. Valenti and Dr. Kowal about the nature of the complaint.  They said that they did not have to share any

information with him.  Kellie Valenti did most of the talking.  She was consistently disrespectful towards the plaintiff, speaking to him in a hostile and nasty manner while sipping on a straw from a plastic cup.  She acted as if she was plaintiff's adversary.

22.    Plaintiff pointed out that he had procedures scheduled at Samaritan Hospital that morning starting at 8:00 am (he had three patients scheduled for coronary angiograms). They told plaintiff not to worry about it; it would be taken care of.  Plaintiff also shared with them that he had office notes from July 30, 2019 that he needed to complete. They replied that they would take care of it and refused to allow plaintiff to complete his notes which he is required to do by law.  They blocked plaintiff's access to his computer, email, and basically everything related to SPHPMA effective immediately.

23.    Plaintiff was advised by Killie Valenti and Dr. William Kowal to communicate with Anna Bauer, who is the director of Human Resources, regarding anything plaintiff needed moving forward. Kellie Valenti and Dr. William Kowal left the conference room while plaintiff was trying to talk with them; they said that there was nothing more to talk about.  They refused to answer plaintiff's questions or give him any details regarding what had taken place.

24.    After plaintiff left the conference room, he drove to his office in Troy to collect his personal belongings.  While walking back to the office, plaintiff was surrounded by Troy police and asked not to go anywhere.  Later on, the security director for Samaritan Hospital arrived and recognized plaintiff.  The security director indicated he was unaware of what was going on and asked plaintiff to wait while he went up to the office.  While plaintiff was waiting for him to return, plaintiff asked one of the police what was going on.  The officer related that someone from the office (third party) called 911, said plaintiff was fired this morning, and that the person was not comfortable with plaintiff being in the office.  Then the security director for Samaritan Hospital came down and told plaintiff that SPHPMA did not want plaintiff to go into his office

to get his personal belongings and wanted him to coordinate with Anna Bauer to arrange for a time to get his things.  Plaintiff was then allowed to leave.

25.     That same day, July 31, 2019, plaintiff called his partner Dr. James Phillip but could not reach him because he was on vacation.  Plaintiff spoke with his partner Dr. John Filippone, who is a member of the JOC. Dr. Filippone said that the JOC knew about plaintiff's termination before plaintiff met with the practice administrators and that Kellie Valenti instructed them not to share any information with plaintiff regarding their decision to terminate his contract.

26.     Plaintiff also called and spoke with Dr. Alan Sanders who is the chief medical officer for both Samaritan and St. Peter's Hospitals, facilities under the aegis of SPHP.  Dr. Sanders said that he became aware of what happened to plaintiff that morning and that he was surprised and not happy with it.  Dr. Sanders also said that he never received any complaint against plaintiff and described plaintiff's employment file as "clean."    He also related that he spoke with members of the medical executive committee and Human Resources at Samaritan hospital and was told that there were no complaints or issues related to plaintiff.  Dr. Sanders said that this issue is related to SPHPMA and had nothing to do with the hospital system.  He indicated that the process for any complaint against plaintiff was not appropriately followed.  Plaintiff and Dr. Sanders agreed to meet on August 5, 2019, to discuss this issue in person.  However, Dr. Sanders called plaintiff before the meeting on August 5 and said he was told by Dr. Steven Hanks (Chief Medical Ifficer of SPHP) not to meet with plaintiff because this issue is related to SPHPMA and not related to the hospital system.  Dr. Sanders was very supportive and understanding towards the plaintiff and apologized for not being able to help.

27.     On July 31, 2019. plaintiff also spoke with Dr. Paul Barbarotto who was the former chairman of the board for SPHPMA, whom he knew very well from working together. Dr. Barbarotto said that he only became aware of the decision to terminate plaintiff's contract that

day and was frustrated and not happy with what happened. He did not have any details to share about why this occurred.

28.     Plaintiff also called Dr. James Reed's office to meet with him (President and CEO of SPHP). Dr. Reed's assistant said he was going on vacation the following week. She promised to speak with Dr. Reed and get back to plaintiff.

29.     Plaintiff received a call the next day from Dr. Steven Hanks (Chief Clinical Officer SPHP) who said Dr. Reed asked him to meet with plaintiff because Dr. Reed was tied up. Plaintiff met with Dr. Hanks on August 8, 2019 and told him what had taken place. Dr. Hanks told plaintiff that he never heard any complaint against plaintiff and also described his file as "clean." He said the process for handling a complaint against a physician was not followed. He related a story about another physician who had alcohol and drug issues. It took SPHPMA two years to terminate his contract. He was confused about what took place regarding the termination of plaintiff's employment. He reiterated the usual practice in handling complaints was not followed. Later, he sent plaintiff a follow-up email and deferred the decision to SPHPMA although the SPHPMA president reports to him.

30.     On August 2, 2019, Dr. James Phillip returned plaintiff's call early in the morning and related that he did not know the nature of the complaint against plaintiff. He and the rest of the JOC members were aware of the decision of SPHPMA to terminate plaintiff's contract but were instructed by Kellie Valenti not to share information with plaintiff.

31.     That same day, August 2, 2019, plaintiff met with Anna Bauer, Director of Human Resources of SPHP, at her office to try to get answers regarding the situation. Ms. Bauer told him that there was a complaint from Samaritan Hospital. Someone called the 800 compliance phone number. It triggered an HR investigation that, in her words, was carried out by a "low level, entry level" HR employee. She said that apparently someone indicated that plaintiff

discriminated against female technicians in the catheterization laboratory (cath lab) and only wanted to work with male technicians. She told plaintiff that the HR employee interviewed personnel in the catheterization laboratory at Samaritan and St. Peter's Hospitals and also at Albany Associates in Cardiology's Troy office. HR was told that plaintiff was difficult to work with. The low level HR employee made recommendations to terminate plaintiff's contract for cause. According to Ms. Bauer, the HR report and investigation results were not reviewed or approved by any supervisor or director. Plaintiff shared his concerns regarding the process with Ms. Bauer. She said the process "is not perfect."

32.     Paintiff told Ms. Bauer that he had no idea what HR was talking about. There was no basis for concluding plaintiff wanted to work only with male technicians. Plaintiff explained to her that there were two female technicians at the Samaritan hospital cath lab, Crystal and Ashlei. Plaintiff was personally involved in training Crystal to perform interventional procedures, which required a lot of work on his part that he was not obligated to do. This was for the benefit of Crystal and the team. A few months ago, Crystal told plaintiff that she would be leaving Samaritan Hospital's cath lab to work at Albany Medical Center's Electrophysiology lab because she was tired of the drama and difficult work environment at the Samaritan Hospital cath lab. Albany Medical Center was also offering her more money and a no on-call schedule. Plaintiff called Brenda Williams who is the cath lab director at Samaritan Hospital on behalf of Crystal to see what could be done to keep Crystal at the Samaritan cath lab. Plaintiff told Ms. Williams that Crystal was a very skilled and important member of the cath lab and that they should do everything possible to try to keep her at Samaritan Hospital. Plaintiff offered to write emails in support of keeping Crystal in the cath lab. Ms. Williams told plaintiff that he was the only physician who called her regarding Crystal and that she was very appreciative and thankful he took the time to support Crystal. Plaintiff shared with Crystal and Cyrus (cath lab manager) that

he called Ms. Williams to support Crystal.

33.     Ashlei also wanted to start doing advanced and complex interventional cases because the cath lab was short-handed with technicians.  She needed a lot of training and supervision. Plaintiff agreed to help train her just as he did with Crystal.  Plaintiff, Ashlei, and Cyrus all agreed on the plan.

34.     Clearly plaintiff supported the female technicians.  Moreover, even if plaintiff were doing something wrong, policy required that he be informed and given the opportunity to correct it.

35.     Samaritan cath lab had shortages of nurses and technicians.  They have agency nurses who cover the cath lab (traveling nurses who come from time to time and are not employees of the Hospital).  Plaintiff was doing an interventional case and had Christie (an agency nurse) scrubbed with him.  Plaitniff requested her to start Angiomax, which is a blood thinner medication before he started the case.  She said she would.  He needed to confirm this was done. He asked her again before starting the intervention if she had started the Angiomax and she siad she had.  While plaintiff was doing the intervention, he started noticing filling defects in the artery.  Then he asked Christie again if she had started the Angiomax but this time she said she did not start the Angiomax because she did not know how to mix it and that she also does not know how to use drips.  This is a basic skill for any cath lab nurse.  Plaintiff asked Cyrus, the cath lab manager, and Cala, a team leader, to come to the cath lab to help.  Cala, who is a nurse, took over from Christie and finished the case.  The patient did well.  Afterwards, plaintiff spoke with Cyrus who asked him to inform Samaritan HR in writing.  Plaintiff declined to write a complaint about Christie.  He explained that Cyrus had to make sure lab nurses, especially agency nurses, are trained in and comfortable doing interventional cases.  That is a basic part of his job.

36.     A few weeks later, plaintiff had a very sick patient with an acute heart attack coding with

cardiac and respiratory arrest.  Christie was the nurse again in the lab.  She could not do anything to help with the situation.  Other nurses had to be brought in.  Afterwards, plaintiff had the same discussion with Cyrus.  Again Cyrus asked plaintiff again to write a complaint about Christie and again he declined.  Plaintiff repeated that Cyrus needed to make sure that she gets the training required to be in the cath lab.

37.    At no time did plaintiff attempt to penalize Christie, the female agency nurse involved. Plaintiff's interest was in supporting the success of the lab, not penalizing people.

38.    Plaintiff shared all these details with Ms. Bauer.  She said he should have written up both Christie and Cyrus so it would have been documented and to protect himself in the future.  She added that she would communicate with Eric Farrell, the lawyer for SPHPMA, to see if there is anything that could be done to reverse the decision so plaintiff could get his job back.

39.    The following week, plaintiff spoke with Ms. Bauer over the phone; she told him that Mr. Farrell informed her that the decision was irreversible.

40.    On August 15, 2019, in accordance with a pre-arranged appointment, plaintiff went to his Troy office to collect his personal belongings along with Anna Bauer and Matthew Cirincione (administrator in the cardiology group).  Plaintiff found that his office was totally cleaned out and asked Ms. Bauer what happened to his personal belongings (which were stored inside drawers in plaintiff's desk).  She claimed that she did not know.  Then she left to make phone calls and was texting people. When she came back, she said that she let plaintiff down.  She indicated that someone from administration had a shredding company come and take plaintiff's personal belongings without his knowledge or consent.  Plaintiff had been assured by Kellie Valenti, Dr. William Kowal, and Anna Bauer that his office would be locked until he went with Ms. Bauer to collect his personal belongings.   Instead, plaintiff's personal belongings were intentionally destroyed without his knowledge or consent.  The personal items included pictures

of plaintiff with his daughter, a lot of cards from his daughter for his birthday, father's day, and other occasions that cannot be replaced.  Cards from patients thanking plaintiff for saving their lives and helping them were also destroyed.  Financial documents including paycheck stubs and retirement plan information of a very personal and private nature were missing.  Plaintiff emailed Dr. Hanks and Ms. Bauer to document this mistreatment yet no one responded.

41.     While plaintiff was leaving the parking lot that day, he ran into a colleague, Dr. Joseph Farooq, who is a pulmonologist.  Dr. Farooq said his group was upset regarding the way plaintiff was treated. They held a special meeting to see how they could help.  Dr. Farooq related that he heard a rumor plaintiff was stealing equipment from his Troy office on July 31, 2019 and that someone called 911 to stop plaintiff from stealing equipment.  Dr. Farooq said that SPHPMA just wanted to humiliate plaintiff and discredit him.

42.     Plaintiff spoke on multiple occasions over the phone with his former partners Dr. James Phillip and Dr. John Filippone to see what the cardiology group could do to help.  Plaintiff was told that the group could not help because the decision to terminate his contract was made by SPHPMA and not by the cardiology group.  Dr. Phillip also related that he was instructed by Kellie Valenti, the interim president for SPHPMA, "to stand down."

43.     Plaintiff again reached out via email to Dr. James Reed (President and CEO of SPHP) to meet with him.  He agreed to meet with plaintiff along with Dr. Hanks.  That meeting did not take place because, on August 23, 2019, plaintiff received a threatening email with a letter dated August 20, 2019, from Eric Farrell, lawyer for SPHPMA, indicating that plaintiff was not allowed to communicate with anyone from SPHPMA, that it would be considered harassment if he did so, and that Dr. Reed would not be meeting with him.

44.     The by-laws of SPHPMA provide as follows:  "No physician's employment by the Corporation may be terminated for cause unless such physician is first given the opportunity to

appear before the Board at a duly convened meeting to present his/her case against such termination . . . The physician may bring one attorney to such meeting to represent him/her . . ." A termination arising from sex discrimination is a termination of cause such that plaintiff should have been entitled to notice of the allegations and to present his defense.  By instead characterizing this as a termination "for convenience," defendants manipulated the process to deprive plaintiff of any right to be heard.  If in fact sex discrimination was not the reason for the termination, and the termination was in fact "for convenience," the sex discrimination allegation was used as a pretext to terminate plaintiff for some other reason, no reason, or a malicious reason.  The use of an allegation of sex discrimination as a weapon in the workplace to target an employee for some other reason is unlawful as indicated *infra*.

45.     Furthermore, the SPHP Code of Conduct states that in the course of disciplinary action the following will occur:  "In determining the appropriate level of discipline, the circumstances of the violation will be considered in light of the severity of the violation.  Records of corrective action and related follow-up conferences are documented immediately following the violation. These documents are shared with the employee and the employee is given the opportunity to add comments."  No consideration was given to determining the severity of the violation, whatever it might have been.  Nor were the circumstances considered, as plaintiff was not permitted to present any countervailing facts.  There were no follow-up conferences.  Plaintiff was not given the opportunity to comment and defend himself against any accusations, whatever they may have been.

46.     This was a disciplinary termination whether characterized as "for cause" or "for convenience" as it arose from a complaint supposedly of sex discrimination.

47.     Many of the persons who should have been involved in the disciplinary process and/or decision to terminate plaintiff's employment told him they were unaware of any misconduct on

his part.

48.    In investigations of other misconduct by physicians, the accused was provided with the procedural protections in the by-laws but since this case involved an allegation of sex discrimination, no procedural protections at all were followed, thus indicating bias against a male accused of discrimination by a female.

49.    Sex discrimination was falsely used in bad faith as a vehicle for terminating plaintiff's employment.

### COUNT I: DISCRIMINATION UNDER TITLE VII

50.    Plaintiff was highly qualified for the position he held and an excellent performer in his position.

51.    Plaintiff was discharged from his employment under circumstances that give rise to an inference of discrimination on the basis of plaintiff's sex.

52.    An alleged complaint of sex discrimination against plaintiff was used a rationale for plaintiff's dismissal.  However, plaintiff was not interviewed in connection with this complaint. Plaintiff requested to know but was not informed of the nature of the complaint. The investigatory procedures and protocols of his employer were not followed, despite his written objections.

53.    Upon information and belief, sex discrimination was used as a pretext to fire plaintif for other reasons, a malicious reason, or for no reason.  Under recent case law, an allegation of sex discrimination without appropriate investigation as a weapon to fire a male employee for reasons unrelated to sex discrimination, for a malicious reason, for no reason, or in bad faith is itself a termination on the basis of sex in violation of Title VII.  *Menaker v. Hofstra University*, 2019 U.S.App. LEXIS 24283 (2nd Cir. August 15, 2019).

54.     Defendants showed bias against males by crediting a bare allegation of sex discrimination without any investigation whatsoever, and, upon information and belief, discovery in this action will demonstrate explicit bias, as plaintiff was not privy to any of the events leading up to his termination.

55.     Plaintiff's sex was a substantial factor in the termination of his employment.

56.     The acts of defendants, through their employees, and on their own behalf, constitute unlawful discrimination against plaintiff on the basis of his gender in violation of Title VII.

57.     No performance-based reason was ever advanced for the termination of plaintiff's employment, so there is no reason why plaintiff should not be reinstated to his position with SPHPMA.

58.     Defendants shall reimburse plaintiff for all loss of back pay, loss of benefits, loss of savings, loss of earning capacity ("front pay"), loss of pension benefits, and other monetary losses he has suffered as a result of defendants' conduct.

59.     Defendants shall pay plaintiff compensatory damages for the pain, suffering, emotional harm, loss of enjoyment of life and other harm suffered by plaintiff as a result of defendants' conduct.

## COUNT II: PUNITIVE AND LIQUIDATED DAMAGES

60.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

61.     Defendant's discriminatory actions were intentional, wanton, willful, reckless, and malicious, and demonstrated utter and heedless disregard for plaintiff's right to be free from sex discrimination in the workplace.

62.     Plaintiff is entitled to punitive damages from defendants.

## COUNT III: BREACH OF CONTRACT

63.     Repeats and realleges each of the foregoing allegations as if fully set forth herein.

64.      Plaintiff was contractually entitled to the procedural protections provided to all physicians in the course of their employment as pleaded in ¶¶s 44 and 45 herein. Plaintiff is entitled to these procedural protections pursuant to his Physician Employment Agreement dated April 30, 2018.

65.      Plaintiff was not provided with any of those protections.

66.      Defendants breached their contract with plaintiff.

67.      Had such breach not occurred, plaintiff would not have been terminated from employment.

68.      Plaintiff is entitled to damages as aforesaid except for emotional and punitive damages.

WHEREFORE, plaintiff seeks a Judgment against defendants, ordering, adjudging, and decreeing that:

A.      Defendants violated Title VII and breached their contract with plaintiff.

B.      Defendants shall reinstate the plaintiff to his position with SPHPMA.

C.      Defendants shall reimburse plaintiff for all loss of back pay, loss of benefits, loss of savings, loss of earning capacity ("front pay"), loss of pension benefits, and other monetary losses he has suffered as a result of defendants' conduct.

D.      Defendants shall pay plaintiff compensatory damages for the pain, suffering, emotional harm, loss of enjoyment of life and other harm suffered by plaintiff as a result of defendants' conduct (except as noted in ¶ 68).

E.      Defendants shall pay punitive damages to plaintiff (except as noted in ¶ 68).

F.      Defendants shall pay the costs, disbursements, expenses, and reasonable attorneys' fees incurred by plaintiff in the prosecution of this action.

G.      Plaintiff be awarded such other and further relief as the Court deems appropriate.

Dated:  Albany, New York
        April 13, 2021

                                COOPER ERVING & SAVAGE LLP
                                Attorneys for Plaintiff
                                39 North Pearl Street

Albany, New York  12207
(518) 449-3100

By: _____
Phillip G. Steck (102664)